IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex rel. )
IAN BOMKAMP,                      )
                                  )
                Petitioner,       )
                                  )
        v.                        )      No. 06 C 4473
                                  )
TERRY McGANN,                     )
                                  )
                Respondent.       )

## MEMORANDUM OPINION AND ORDER

Petitioner Ian Bomkamp, along with Oscar Martinez and

Jeff Iniguez, were tried before a jury in the Circuit Court of

Cook County, Illinois. All three were found guilty for the first

degree murder and aggravated battery of Walter Warlyn. Warlyn

was a member of a gang that was a rival of the gang to which

Bomkamp and his two co-defendants belonged. Following their

convictions, Bomkamp and Martinez were sentenced to 50 years'

imprisonment, and Iniguez was sentenced to 40 years'

imprisonment. Although tried jointly, Iniguez's appeal was

considered separately from the appeals of Bomkamp and Martinez.[1]

---

[1]Bomkamp and Martinez filed separate appellate briefs.
The Illinois Appellate Court found that the arguments raised by
each of them were "virtually identical." People v. Martinez,
No. 1-02-2299 at 7 (1st Dist. Ill. App. Ct. June 20, 2005).

The convictions and sentences of Bomkamp and Martinez were affirmed in an unpublished order. See People v. Martinez, No. 1-02-2299 (1st Dist. Ill. App. Ct. June 20, 2005) ("Martinez I"), appeal denied, 217 Ill. 2d 582, 844 N.E.2d 44 (Dec. 1, 2005), cert. denied, 126 S. Ct. 1919 (May 1, 2006). Iniguez's appeal was heard before a different panel of the Illinois Appellate Court. In a 2-1 decision, Iniguez's conviction was reversed and the case remanded for further proceedings.[2] See People v. Iniguez, 361 Ill. App. 3d 807, 838 N.E.2d 65 (1st Dist. Oct. 18, 2005), appeal denied, 217 Ill. 2d 579, 844 N.E.2d 43 (Dec. 1, 2005).

In September 2005, Bomkamp filed a petition for post-conviction relief in the Circuit Court of Cook County. In August 2006, Bomkamp filed his federal habeas corpus petition. On September 28, 2006, the state post-conviction petition was denied. Petitioner, who is represented by the same attorney that represented him at trial and on direct appeal,[3] was given the opportunity to withdraw his federal habeas corpus petition and,

The Illinois Appellate Court did not distinguish between the arguments made by each appellant, applying all rulings to each of them.

[2]The dissenting justice in Iniguez was also a member of the panel that decided Martinez I.

[3]On the post-conviction petition, Bomkamp is represented by a different attorney.

if appropriate, refile it after the exhaustion of the additional claims contained in his state post-conviction petition. Petitioner chose to continue to proceed on the pending claims, which he contends are fully and adequately exhausted.

The petition contains four grounds for relief.[4] Ground One is that Bomkamp was compelled to testify in violation of his constitutional right against self-incrimination because gang tattoos that he has were photographed and displayed to the jury. Ground Two is that Bomkamp was denied a fair trial in violation of federal constitutional principles based on the gang-related evidence, including hearsay, that was admitted at his trial.[5] Ground Three is that Bomkamp was denied his constitutional right to confront the witnesses against him because the trial court improperly limited the scope of his cross

---

[4]Codefendant Martinez also filed a federal habeas corpus petition raising the same four grounds. In that proceeding Martinez is represented by the same attorney who represents Bomkamp in his state post-conviction proceeding. Martinez's habeas petition was recently denied by a different judge of this court. See United States ex rel. Martinez v. McCann, 2007 WL 914309 (N.D. Ill. March 23, 2007) ("Martinez II"). No appeal was filed.

[5]Iniguez's reversal was based on this ground, see Iniguez, 838 N.E.2d at 73-74, and an improper jury instruction, see id. at 70-72. In his direct appeal, Bomkamp did not raise the jury instruction issue that was raised by Iniguez for the first time on appeal. In Iniguez's appeal, the jury instruction issue was reviewed for plain error since no objection to it had been raised in the trial court. See id. at 71.

examination of two witnesses, sustaining 52 objections as to one witness and 10 as to another.[6] Ground Four is that the reversal in Iniguez's appeal and affirmance in Bomkamp's appeal deny Bomkamp federal due process and equal protection rights.[7] Respondent contends all the claims fail on their merits. Respondent also contends that Ground Two (other than the hearsay contention) is procedurally defaulted because the issue was not fairly presented as a constitutional argument before the Illinois courts. Additionally, respondent contends that one supporting argument raised in Ground Four (based on a policy favoring joint trials and appeals) is procedurally defaulted because not presented to the Illinois courts.

Martinez does not dispute the Illinois Appellate Court's recitation of the facts. Therefore, these facts are presumed correct for purposes of habeas corpus review. 28 U.S.C. § 2254(e)(1); Martinez II, 2007 WL 914309 at *1. This court

---

[6]Although petitioner recites a different number of questions in the memorandum filed with his petition, these number of questions are listed in appendices to his reply. Also, in the reply, petitioner drops his contentions regarding the cross-examination of another witness.

[7]Since Iniguez's appeal was decided after Bomkamp's, this issue was raised for the first time in a supplement to Bomkamp's petition for leave to appeal. There is no contention by respondent that an adequate presentation of this ground requires that it be raised in a post-conviction petition and subsequent state appeals.

adopts the description of the evidence presented at trial as set forth in Martinez I, at 2-7.  Cf. Martinez II, 2007 WL 914309 at \*1-4.

Roland Warlyn, the father of the victim, testified that he owned a catering business that was located in a building that also had an apartment in which the victim lived.  The victim, who was a heroin user and gang member, also worked in the business. On December 16, 1998, the victim borrowed the catering business's white Ford van for the evening.  When the father arrived at work the next morning, lights were left on and fast food cups were on the floor.  The victim did not appear for work and his father later learned that his son had been killed.

On December 17, 1998, Chicago Police Officer D. Finley was dispatched to Legion Park to investigate a possible death. Finley found the victim lying face down and without a pulse. Upon turning him over, Finley notice severe trauma to the head and face and a bullet wound to the temple.  Finley noticed a large tattoo on the victim's abdomen that he recognized as representing membership in the Imperial Gangsters street gang.  A set of keys was in the victim's pocket, which were matched to a white Ford van parked approximately 100 yards from Legion Park.

Chicago Police Officer Vito Ricciardi testified that, in February 1999, he arrested Jill DeShon on a drug charge unrelated

to the murder. After her arrest, DeShon informed Ricciardi that she had information related to the murder. Based on this information, Ricciardi began investigating Bomkamp, Martinez, and Iniguez.

At trial, DeShon testified that, on the evening of December 16, 1998, she went to Legion Park with friends. Bomkamp, whom DeShon knew to be a ranking member of the Simon City Royals street gang, was with DeShon at the park. DeShon left to meet Bonnie Lopez at a nearby restaurant and then the two returned to the park to meet Bomkamp. Eventually, Martinez and Iniguez arrived. DeShon knew Martinez was also a Simon City Royals member. Two other men were also with them, but DeShon did not know their identity. The group drank alcohol and smoked marijuana at the park. DeShon did not drink, but smoked some marijuana.

DeShon further testified that the group left the park between 10 and 11 p.m. They drove around for a while looking for drugs and eventually stopped at the Bottoms Up Social Club. DeShon and Lopez were allowed to use the restroom at the club, but the men were not allowed in. DeShon saw the victim at the door of the club talking with the men who had accompanied DeShon. DeShon saw the victim leave the club in a white van, accompanied

by Bomkamp. DeShon left in Martinez's car with the others. In the car, Iniguez said "they" were going to beat up the victim.

The group, including the victim, again met up at Legion Park. Deshon and Lopez sat on a bench while the others were nearby. DeShon saw the five men begin hitting the victim with their fists. The victim fell to the ground and yelled at them to stop. The men then began kicking the victim. Bomkamp left the group and walked in the direction of a fence located near the perimeter of the park. DeShon believed the Simon City Royals hid guns near the fence. Bomkamp returned with a gun and shot the victim. After hearing the gunshot, DeShon told Lopez, who was pretty drunk at the time, to get up. The two women walked to Martinez's car and got in. Martinez, Iniguez, and one of the unknown men also got into the car. The other unknown man stayed behind and fired more gunshots. DeShon saw Bomkamp go to the victim's van, but did not see what he did there. Bomkamp and the other man then got into the car and they all drove away. Iniguez, DeShon, and Lopez were dropped off near DeShon's house. Iniguez told DeShon not to say anything about what she had seen at the park.

DeShon testified that, on February 9, 1999, she was arrested by Officer Ricciardi on a drug charge. About one week later, DeShon called Ricciardi and told him about the murder.

DeShon testified she had not contacted police earlier because Iniguez had threatened her. After her arrest, DeShon's mother convinced her to contact police. The police did not offer DeShon a deal in exchange for her testimony.

On cross-examination, DeShon admitted to being a drug user and having been arrested for unlawful use of a weapon and possession of a controlled substance with intent to deliver. DeShon denied telling police about the murder to obtain lenity on the pending charges. DeShon was living with Lopez at the time she told Ricciardi about the murder. DeShon told Ricciardi that Lopez had been at the park, but denied discussing the murder with Lopez.

A Cook County forensic pathologist testified that he performed an autopsy on the victim. The pathologist observed several abrasions and bruises to the victim's face and body. He also observed two entry wounds and one exit wound from gunshots. Tests showed the victim had consumed cocaine, heroin, and alcohol before he was killed. The pathologist believed the cause of death was multiple gunshot wounds.

Oscar Montanez testified that he was a member of the Imperial Gangsters and knew the victim as a fellow member. Montanez testified that members wore black and pink and receive a tattoo with the Imperial Gangster crown. Montanez testified as

to an incident that occurred in the summer of 1998, approximately six months before the murder. In that incident, the victim and Montanez engaged in a street fight with members of the Simon City Royals. During the fight, the victim threw a can, injuring a Simon City Royal. Bomkamp, Martinez, and Iniguez were not involved in or present during this incident.

Montanez further testified that, on December 16, 1998, he was at the Bottoms Up Social Club when the victim walked in with a group of Simon City Royals. There were also two women with the group. The club was located within Imperial Gangster territory. Montanez told the victim that the group could not enter. The victim told Montanez that he had grown up with the men and they were "cool." Montanez argued with the victim and would not allow the group in. The women were allowed to use the restroom. Montanez saw the victim get into a white van and drive away with the group.

Lopez testified that she had known Bomkamp for several years. She knew Bomkamp as a ranking member of the Simon City Royals. On December 16, 1998, Lopez was at a restaurant where she met Bomkamp and DeShon. She left with them to go to Legion Park. They met Martinez and Iniguez there, and others she did not know. After about an hour, she got into Martinez's car, along with DeShon, Martinez, Bomkamp, and Iniguez. They went to

a social club where they met the victim. She and DeShon were allowed to use the restroom and then they left. She, DeShon, Martinez, and Iniguez returned to the park in Martinez's car. Lopez testified she was intoxicated at the time and did not recall seeing Bomkamp and the victim when they returned to the park. Lopez was laying down on a bench resting, with DeShon also on the bench. Lopez heard kicking and a yell for help. Then she heard a gunshot and DeShon told her to get up. Lopez and DeShon then walked to Martinez's car and the two women got into it. While walking, Lopez had heard a couple more gunshots. Martinez joined them in the car and they drove away. Martinez warned them not to say anything about what happened. DeShon and Lopez were dropped off near DeShon's house.

Lopez denied discussing events of that night with DeShon. It was not until February 1999 that the police came to Lopez's house to question her about the murder. Lopez did not contact the police herself because she was afraid of what might happen to her.

Chicago Police Officer Joe Rodriguez testified that he was a gangs crime specialist for 26 years. Rodriguez was assigned to investigate the murder. He arrested Bomkamp, Martinez, and Iniguez. On several photographs taken of Bomkamp, Martinez, and Iniguez while in custody, Rodriguez identified

tattoos on the defendants' bodies. Rodriguez testified that the tattoos represented the Simon City Royals.[8] Rodriguez also identified photographs of the victim's Imperial Gangsters tattoo. Rodriguez testified that the two gangs were fighting during the latter part of 1998. Rodriguez based this last statement on what Gabriel Flores had told him. Flores was in custody on unrelated charges.

John Hart testified that he was a forensic scientist employed by the Illinois State Police. Hart identified a fingerprint and palm print found on the victim's van as matching Bomkamp's prints.

There is no dispute that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to this case. In accordance with the AEDPA, relief in this case cannot be granted unless the state court's merits decision on a particular issue was contrary to or an unreasonable application of federal law clearly established by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007). "A state-court decision is contrary to Supreme

---

[8]The photographs are not part of the record provided to this court. Trial testimony supports that Simon City Royals tattoos in the photographs were on Bomkamp's right shoulder (R. 687), left arm (R. 687, 689), back (R. 689), "top shoulder blade" (R. 691), middle of the back (id.), and "one of the legs" (R. 692).

- 11 -

Court precedent if it is inconsistent with the Supreme Court's treatment of a materially identical set of facts, or if the state court applied a legal standard that is inconsistent with the rule set forth in the relevant Supreme Court precedent. A state-court decision constitutes an unreasonable application of Supreme Court precedent within the meaning of section 2254(d)(1) when, although it identifies the correct legal rule, it applies that rule in a way that is objectively unreasonable. Our own disagreement with a state court's analysis is not sufficient to meet this standard; rather, the state court's analysis must lie 'well outside the boundaries of permissible differences of opinion' in order for us to characterize it as an unreasonable application of Supreme Court precedent." Gilbert v. Merchant, ___ F.3d ___, 2007 WL 1651099 at *8 (7th Cir. June 8, 2007) (citations omitted).

The first ground raised by petitioner is that photographic evidence of his Simon City Royals tattoos violated his constitutional right to not be compelled to incriminate himself. The Appellate Court held that the tattoos are communicative and testimonial in nature, but were not compelled because voluntarily disclosed on Bomkamp's body. Martinez I, at 12-13. Citing United States v. Hubbell, 530 U.S. 27 (2000), and Fisher v. United States, 425 U.S. 391 (1976), the Appellate Court recognized that the United States Supreme Court had

- 12 -

distinguished between producing previously made communications, and the actual act of production itself being a communication. Martinez I, at 12-13.

No Supreme Court decision addresses the specific issue of whether a defendant can be required to disclose a tattoo to the jury without violating the right against compelled self-incrimination. Therefore, petitioner must rely on an unreasonable application of existing precedents. It was a reasonable application of Supreme Court precedents to hold that photographs of existing tattoos are the production of previously existing communications, not a communicative act in itself. See People v. Slavin, 1 N.Y.3d 392, 807 N.E.2d 259, 263-65, cert. denied, 543 U.S. 818 (2004); Martinez II, 2007 WL 914309 at *9. Ground One does not state a basis for providing habeas corpus relief.

Ground Two is based on the gang-related evidence that was presented at trial. Respondent contends most of this issue was procedurally defaulted because only raised as a state law evidentiary issue before the Illinois Appellate Court. In determining whether a constitutional issue cognizable in a federal habeas corpus petition has first been fairly presented to the state court, four factors are considered: "1) whether the petitioner relied on federal cases that engage in a

constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." Anderson v. Benik, 471 F.3d 811, 815 (7th Cir. 2006) (quoting Ellsworth v. Levenhagen, 248 F.3d 634, 639 (7th Cir. 2001); Wilson v. Briley, 243 F.3d 325, 327 (7th Cir. 2001); Verdin v. O'Leary, 972 F.2d 1467, 1473-74 (7th Cir. 1992)).

As respondent contends, Bomkamp's argument to the Illinois Appellate Court did not expressly refer to the federal Constitution and all the cases cited were Illinois cases. The cases cited generally discuss evidentiary standards, but do include references to a fair trial and inflammatory evidence, though without referring to the federal Constitution or federal cases. Throughout his argument to the Appellate Court, Bomkamp repeatedly refers to the inflammatory and prejudicial nature of the evidence and its lack of probative value. He closes the argument by asserting:

> The only purpose of the gang evidence at bar was to inflame passions, and arouse prejudice against defendant.
> This highly improper evidence deprived defendant of a fair trial. For this error, by

- 14 -

itself, a new trial should be ordered if
                defendant's conviction is not reversed outright.

Resp. Exh. A at 28.

        Federal due process includes the right to a fundamentally
fair trial.  The admission of inflammatory and unduly prejudicial
evidence may violate this right.  Koo v. McBride, 124 F.3d 869,
874-75 (7th Cir. 1997); Rose v. Duckworth, 769 F.2d 402, 405
(7th Cir. 1985); United States ex rel. Kirk v. Washington, 932
F. Supp. 1053, 1061 (N.D. Ill. 1996).  Although Bomkamp failed to
expressly refer to the federal Constitution nor cite any cases
expressly applying constitutional principles, the argument he
made was framed in terms bringing to mind the due process right
to a fair trial.  Also, here he relies on the exact same facts
that were the basis of the argument presented to the Appellate
Court.  However, it is the rare case where a constitutional issue
will be fairly presented without expressly referring to the
constitutional basis of the claim, citing any federal cases, nor
even citing a state case expressly relying on the federal
principles.  See Verdin, 972 F.2d at 1475; Chambers v.
McCaughtry, 264 F.3d 732, 739 (7th Cir. 2001), cert. denied, 534
U.S. 1165 (2002).  It may also be considered that the Appellate
Court addressed the issue as a state evidentiary issue.  Bomkamp
did not raise in his petition for rehearing, petition for leave
to appeal, or amended supplement to his petition for leave

                              - 15 -

to appeal that the Appellate Court failed to consider the
constitutional nature of this issue. See Harding v. Sternes,
380 F.3d 1034, 1048 (7th Cir. 2004), cert. denied, 543 U.S. 1174
(2005). It is doubtful that this issue was fairly presented to
the Appellate Court as a constitutional claim so as to preserve
it for federal habeas corpus review. See United States ex rel.
Robinson v. McDory, 2003 WL 21212610 *3 (N.D. Ill. May 22, 2003).
But see Martinez II, 2007 WL 914309 at *11.[9] In any event, for
the reasons discussed below, this issue fails on its merits.
Therefore, it is unnecessary to resolve whether the issue is also
procedurally defaulted. See 28 U.S.C. § 2254(b)(2); Bell v.
Cone, 543 U.S. 447, 451 n.3 (2005); Williams v. Grams, 2007 WL
1724952 *1 (E.D. Wis. June 12, 2007).

Evidentiary errors normally do not entitle a petitioner
to federal habeas corpus relief. Anderson v. Sternes, 243 F.3d
1049, 1053 (7th Cir.), cert. denied, 534 U.S. 930 (2001).

> Rather, habeas relief is appropriate only if the
> erroneous evidentiary rulings were
>     so prejudicial that [they] compromise[d]
>     the petitioner's due process right to a
>     fundamentally fair trial. This means that
>     the error must have produced a significant
>     likelihood that an innocent person has been
>     convicted. Indeed, because of this high

---

[9]Martinez II holds that the issue was fairly presented.
Before the Illinois Appellate Court, Martinez's argument on this
issue was identical to the argument made by Bomkamp. See
Martinez v. McCann, No. 06 C 6590, Docket Entry 14, Exh. A
at 25-28 (N.D. Ill.).

> standard, evidentiary questions are
> generally not subject to review in habeas
> corpus proceedings.
>
> Howard v. O'Sullivan, 185 F.3d 721, 723-24 (7th
> Cir. 1999). Moreover, "courts must be careful
> not to magnify the significance of errors which
> had little importance in the trial setting."
> Alvarez v. Boyd, 225 F.3d 820, 825 (7th Cir.
> 2000). To consider the significance of the
> alleged errors, a court must examine "the entire
> record, paying particular attention to the
> nature and number of alleged errors committed;
> their interrelationship, if any, and their
> combined effect; how the trial court dealt with
> the errors, including the efficacy of any
> remedial measures; and the strength of the
> prosecution's case." Id.

Id.

Here, the evidence of gangs was not put before the jury

simply to inflame and to prejudice Bomkamp and the other

defendants in the jurors' minds. The evidence helped explain the

relationships between the parties and provide a possible motive

for the killing. It also helped explain why the group did not

stay at the social club. Further, some of the gang evidence

could have aided Bomkamp in that the existence of a rivalry

between the gangs could have been a basis for questioning

Montanez's motivation in testifying. The strongest evidence

against Bomkamp and his codefendants was the eyewitness testimony

of DeShon, with collaborating support from Lopez.[10]  The

---

[10]Lopez testified she heard shots; she did not see the
shots, including who fired or who was hit.

testimony of the two was generally consistent.[11]  There was also

physical evidence linking Bomkamp to the victim's van and

Montanez's testimony also supported that Bomkamp was with the

victim.  It was for the jury to decide whether DeShon and Lopez

were credible witnesses in light of their drug and/or alcohol use

that night, DeShon's past drug use, and the pending charges

against DeShon.  As a matter of constitutional due process, it

cannot be held that the gang evidence was so unrelated and

irrelevant and unduly inflammatory as to undermine the

fundamental fairness of Bomkamp's trial.  Cf. United States ex

rel. Lewis v. Clark, 1999 WL 1269362 *2-3 (N.D. Ill. Dec. 22,

1999).  Also, Bomkamp does not point to evidence supporting that

there is a significant likelihood that an innocent person was

convicted.  The admission of gang evidence in this case does not

state a basis for granting relief.  Cf. Martinez II, 2007 WL

914309 at *11.

Bomkamp also contends that Officer Rodriguez's hearsay

testimony that the Simon City Royals and Imperial Gangsters were

fighting in the latter part of 1998 violated his constitutional

right to confront witnesses.  That issue was fairly presented in

the state courts and respondent does not contend that it was

---

[11]They varied as to whether Bomkamp also came to the
restaurant when DeShon met Lopez, who was in the cars on certain
trips, and whether additional shots were fired as DeShon and
Lopez walked to the car or while already in the car.

- 18 -

procedurally defaulted. Before the Illinois Appellate Court, the state conceded that the admission of the evidence was error but argued it was harmless. The Appellate Court held the error was harmless. Martinez I, at 11. The Appellate Court characterized the evidence of Bomkamp's guilt as being overwhelming. DeShon provided eyewitness testimony as to the beating and shooting and physical evidence was introduced. DeShon's, Lopez's, and Montanez's testimony supported that Bomkamp was with the victim that night. Lopez testified that she heard shots. Also, the Appellate Court characterized Rodriguez's testimony as cumulative of other evidence that the two gangs did not get along. While Rodriguez's testimony was more specific to the time of the murder than was Montanez's testimony about a prior fight, the evidence was cumulative to a degree. In any event, it cannot be held that the Appellate Court's ruling on harmless error was an unreasonable application of Supreme Court precedents on the subject. See Martinez II, 2007 WL 914309 at *12-13. The admission of the hearsay evidence does not state a basis for granting habeas corpus relief.

Ground Three is a confrontation clause claim based on the trial court upholding objections to certain cross-examination

questions that counsel for the three defendants asked DeShon and

Lopez. The Appellate Court stated the following general

principles:

> The right of an accused to confront a
> witness against him includes the right to cross-
> examine. People v. Blue, 205 Ill. 2d 1, 12 792
> N.E.2d 1149 (2001). But the scope of such cross-
> examination is limited to the subject of direct
> examination and permissible matter that affects
> the witness's credibility. Blue, 205 Ill. 2d
> at 13. The trial court has discretion to impose
> reasonable limits on cross-examination to guard
> against harassment, prejudice, jury confusion,
> witness safety or repetitive and irrelevant
> questioning. Blue, 205 Ill. 2d at 13. The
> discretionary authority arises only after the
> court has permitted sufficient cross-examination
> to satisfy the confrontation clause. Blue,
> 205 Ill. 2d at 13.

Martinez I, at 13.

The Appellate Court noted that defendants were provided

an adequate opportunity to cross-examine both DeShon and Lopez on

all the subject matter raised in questioning. As to both

witnesses, the Appellate Court upheld the trial court's

sustaining of objections as repetitive. As to Lopez, the

Appellate Court also upheld the sustaining of a number of

objections based on questions being argumentative, with some also

being upheld as speculative. See id. at 13-15.

The three defendants extensively cross-examined the two

key witnesses. See R. 362-472, 489-90 (DeShon); R. 599-639,

643-45 (Lopez). The Appellate Court's statement of the

applicable law is consistent with United States Supreme Court precedent. See Martinez II, 2007 WL 914309 at *16. Consistent with Supreme Court precedent, cross-examination questions may be limited based on being repetitive, argumentative, or speculative. See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); Searcy v. Jaimet, 332 F.3d 1081, 1088-90 (7th Cir. 2003), cert. denied, 540 U.S. 1192 (2004); United States v. Martinez-Vives, 475 F.3d 48, 53-54 (1st Cir. 2007); United States v. Jadusingh, 12 F.3d 1162, 1167 n.7 (1st Cir. 1994); United States v. Tansley, 986 F.2d 880, 886 (5th Cir. 1993); Martinez II, 2007 WL 914309 at *16; Sarauer v. Frank, 2005 WL 1075617 *12 (W.D. Wis. May 5, 2005).

The Illinois Appellate Court did not unreasonably apply the Supreme Court precedents. It was not unreasonable to hold either that the questions were repetitive, argumentative, and/or speculative or that the questions permitted were sufficient to question the two witnesses regarding the substantive aspects of their testimony and their biases. Cf. Searcy, 332 F.3d at 1088-92. Ground Three does not state a basis for granting federal habeas corpus relief. Martinez II, 2007 WL 914309 at *16.

The last ground raised is that the inconsistent result in the related Iniguez appeal violates Bomkamp's right to due

process and equal protection.[12] Bomkamp points to no Supreme

Court precedent holding that equal protection or due process

compels that one panel of an appellate court rule identically to

another panel of the appellate court regarding any similar

issues[13] raised by codefendants in separate appeals. The Supreme

Court has held that equal protection does not require that

judicial decisions in criminal cases be uniform. Beck v.

Washington, 369 U.S. 541, 554-55 (1962). It has also held there

is no due process or equal protection violation when one

codefendant is convicted and another acquitted on the same

evidence, even when the decision is made in a bench trial.

Harris v. Rivera, 454 U.S. 339, 345-48 & n.21 (1981). One

district court case holds there is no right to consistent

---

[12]In Martinez II, 2007 WL 914309 at *6-7, it was held
that Martinez failed to fairly present to the Illinois Supreme
Court the constitutional basis for this ground. No such argument
is raised by respondent regarding Bomkamp's assertion of this
same ground. The only contention by respondent is that one of
Bomkamp's supporting arguments was not raised before the Illinois
Supreme Court.

[13]The gang evidence issues raised by Bomkamp and Iniguez
in their respective direct appeals were similar, but not
identical. A consideration in both cases was the strength of the
evidence against each defendant. The evidence against Bomkamp
was different than for Iniguez. There was physical evidence
linking Bomkamp to the victim's van. Testimonial evidence also
supported that Bomkamp was in the van with the victim. More
importantly, DeShon testified that she saw Bomkamp retrieve a gun
and shoot the victim. There is evidence that Iniguez kicked the
victim, but no evidence he fired a shot. On the other side,
DeShon testified that Iniguez said they planned to beat up the
victim and Bomkamp was not in the car at the time that was said.

- 22 -

decisions from state appellate courts. <u>Sanders v. Moore</u>, 156
F. Supp. 2d 1301, 1307 (M.D. Fla. 2001). <u>See also</u> 16B C.J.S.
<u>Constitutional Law</u> § 1114 (2007). At least one state supreme
court case acknowledges that the United States Supreme Court has
not held that such a right exists. <u>See</u> <u>Commonwealth v. Cruz</u>, 578
Pa. 263, 851 A.2d 870, 877 (2004).[14] In light of the existing
precedents, it was reasonable for the Illinois Supreme Court to
deny review on this ground.[15] Bomkamp is not entitled to federal
habeas corpus relief on Ground Four.

_____

[14]In <u>Cruz</u>, 851 A.2d at 877-78, the Pennsylvania Supreme
Court held that, in the interests of justice, when one
codefendant's conviction is vacated following the grant of
discretionary review by the Pennsylvania Supreme Court, another
codefendant who was denied discretionary review on the
identically applicable issue should be permitted to again raise
the issue in a post-conviction proceeding and receive the benefit
of the Supreme Court ruling in the codefendant's case. That
holding is not based on the federal Constitution.

[15]Recently, in <u>Roper v. Weaver</u>, 127 S. Ct. 2022 (2007),
the Supreme Court exercised its discretion to apply the more
favorable pre-AEDPA standard to a federal habeas petitioner even
though, due to procedural error, he had been required to refile
his habeas petition after the AEDPA went into effect. His two
codefendants had had their pre-AEDPA federal habeas petitions
resolved in their favor. The Supreme Court exercised "discretion
to prevent these three virtually identically situated litigants
from being treated in a needlessly disparate manner." <u>Id.</u>
at 2024. For two reasons, <u>Roper</u> does not aid Bomkamp on his
federal habeas corpus petition. First, the decision in <u>Roper</u> is
based on the exercise of discretion; it does not hold that the
action taken in that case is mandated by due process or equal
protection or some other constitutional principle. Second, <u>Roper</u>
was decided after Bomkamp's conviction became final and therefore
is irrelevant to the reasonableness analysis under § 2254(d)(1).
<u>See</u> <u>Owens v. Frank</u>, 394 F.3d 490, 501 n.8 (7th Cir.), <u>cert.</u>
<u>denied</u>, 545 U.S. 1118 (2005).

IT IS THEREFORE ORDERED that the petition for writ of habeas corpus is denied. The Clerk of the Court is directed to enter judgment in favor of respondent and against petitioner denying the petition for writ of habeas corpus.

ENTER:

William T. Hort

UNITED STATES DISTRICT JUDGE

DATED: JULY 24 , 2007